1  Christopher C. McNatt, Jr. (SBN 174559)
   cmcnatt@scopelitis.com
2  SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
   2 North Lake Avenue, Suite 460
3  Pasadena, California 91101
   Tel.:  (626) 795-4700
4  Fax:  (626) 795-4790

5  Christopher J. Eckhart
   *Admitted Pro Hac Vice*
6  ceckhart@scopelitis.com
   SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
7  10 West Market Street, Suite 1500
   Indianapolis, IN  46204
8  Tel: (317) 637-1777
   Fax: (317) 687-2414

9
   Attorneys for Defendant,
10 Trimac Transportation Services (Western) Inc.

11

12                  UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14                      SAN JOSE DIVISION

15 DOUGLAS ROBERTS,                    ) Case No. 5:12-cv-05302-HRL
                                       )
16              Plaintiff,             ) Assigned to the Honorable Howard R. Lloyd
                                       )
17         vs.                         )
                                       ) **DEFENDANT'S NOTICE OF MOTION
18 TRIMAC TRANSPORTATION SERVICES      ) AND MOTION FOR PARTIAL SUMMARY
   (WESTERN), INC., a Delaware Corporation, ) JUDGMENT; MEMORANDUM OF
19                                     ) POINTS AND AUTHORITIES**
                Defendant.             )
20                                     ) Date:  June 11, 2013
                                       ) Time:  10:00 a.m.
21                                     ) Depart: #2, Fifth Floor
                                       ) Judge:  Judge Howard R. Lloyd
22                                     )
                                       )
23 _____

24 **TO PLAINTIFF DOUGLAS ROBERTS AND HIS ATTORNEY OF RECORD:**

25         **PLEASE TAKE NOTICE** that on June 11, 2013, at 10:00 a.m., or as soon as counsel may be

26 heard in Department #2, Fifth Floor of the above-entitled Court, located at 280 South 1st Street, San

27

28

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

Jose, California, 95113, Defendant, Trimac Transportation Services (Western) Inc. will and hereby does move this Court for an order for Partial Summary Judgment as to the following issues:

1.    That Defendant is entitled to summary judgment on its affirmative defense that Plaintiff, Douglas Roberts, was exempt from the payment of overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 13(b)(1).

This motion is based upon this Notice of Motion, the accompanying Motion, the accompanying Memorandum of Points and Authorities, the exhibits designated and filed with this Motion, the papers and records on file with this Court, and other such oral and documentary evidence as may be presented to the Court at or prior to the hearing on the Motion.

Dated:  May 7, 2013                                   Respectfully submitted,


                                                      _/s/Christopher J. Eckhart_____
                                                      Christopher J. Eckhart
                                                      Christopher C. McNatt, Jr.

                                                      Attorneys for Defendant,
                                                      Trimac Transportation Services
                                                      (Western) Inc.

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .....................................................................................ii-iii

    I.      INTRODUCTION ........................................................................... 1

    II.    STATEMENT OF THE ISSUES TO BE DECIDED.................................. 2

    III.   BACKGROUND FACTS ................................................................... 2

          A.    General Background ........................................................... 3

          B.    Air Products' Argo Shipments........................................... 4

          C.    Air Products' Dispatching Policies And Practices............... 5

          D.    Plaintiff ........................................................................... 8

    IV.   ARGUMENT .................................................................................. 9

          A.    Plaintiff Transported Goods Across State Lines................10

          B.    Plaintiff Transported Goods In The Last Leg Of An Interstate Movement ...................................................................... 10

              1.    Air Products Had The Required Shipper's Intent At The Time of The Shipment .............................................. 11

              2.    The Purification Of Argon Did Not Terminate The Interstate Movement ............................................... 12

          C.    Plaintiff Was Subject To The Motor Carrier Exemption Pursuant To The Pool Of Drivers Rule.......................................... 14

              1.    Plaintiff Was Subject To Being Dispatched On Both Types Of Interstate Legs .......................................... 14

              2.    The Potential For An Assignment On An Interstate Leg Was More Than Remote .............................................. 16

    V.    CONCLUSION.............................................................................. 18

i

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

## TABLE OF AUTHORITIES

### Cases

*Amador v. Trimac Transportation Services (Western) Inc.,* Case No. CV10-4112-CHK(JCx) .................................................................................... 5

*Amarel v. Connell,* 102 F.3d 1494, 1516 (9th Cir. 1996) ........................ 7

*Barefoot v. Mid-America Dairymen, Inc.,* 826 F. Supp. 1046, 1049 n. 2 (N.D. Tex. 1993) .................................................................................. 16

*Bishop v. Petro-Chemical Transport, LLC,* 582 F. Supp. 2d 1290, 1298 (E.D. Cal. 2008) .............................................................................. 14, 15

*Century Indem. Co. v. Carlson,* 133 F.3d 591, 598 (8th Cir. 1998) ......... 13

*Cruz v. S. Waste Sys.,* 2010 WL 309016, ................................................. 12

*Glanville v. Dupar, Inc.,* 2009 WL 3255292, at * 11 (S.D. Tex. September 25, 2009) ......................................................................................... 12

*Klitzke v. Steiner Corp.,* 110 F.3d 1465, 1469-70 (9th Cir. 1997) ....... 10, 11

*Morris v. McComb,* 332 U.S. 422, 433-34 (1947) .......................... 14, 15, 16

*Reich v. Am. Driver Serv., Inc.,* 33 F.3d 1153, 1156 (9th Cir. 1994) ...... 10, 14

*Saxon Mortgage Servs., Inc. v. Hillery,* C-08-4357 EMC, 2009 WL 2435926, at *1-2 (N.D. Cal. Aug. 3, 2009) ....................................... 3

*Turk v. Buffets, Inc.,* 940 F. Supp. 1255, 1262 (N.D. Ill. 1996) ............... 16

*U-Haul Int'l v. Lumbermens Mut. Cas. Co.,* 576 F.3d 1040, 1043–44 (9th Cir. 2009) ........................................................................................... 3

*Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 569 (1943) ............... 11

*Watkins v. Ameripride Servs.,* 375 F.3d 821, 825 (9th Cir. 2004) ....... 11

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

## Statutes and Regulations

29 U.S.C. § 207 ................................................................................................................... 1

29 U.S.C. § 213(b)(1) ................................................................................................. 1, 2, 9

49 U.S.C. § 13501(1)(A) ................................................................................................. 10

29 C.F.R. § 782.2 ............................................................................................................... 9

29 C.F.R. § 782.7 ....................................................................................................... 10, 13

49 C.F.R. Part 395 ............................................................................................................. 8

## Rules and Other Materials

Fed. R. Evid. 803 ............................................................................................................ 3, 7

Fed. R. Evid. 1006 ............................................................................................................. 7

46 Fed.Reg. 27,902, 37,903 (1981) ................................................................................. 14

5-803 Weinstein's Fed. Evid. § 803.08[8][a] .................................................................... 3

iii

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In his Third Cause of Action, Plaintiff claims he is entitled to unpaid overtime pursuant to the FLSA. 29 U.S.C. § 207.  On February 19, 2013, Plaintiff filed a Motion for Partial Summary Judgment ("Plaintiff's Motion") requesting the Court to enter summary judgment against Trimac on its affirmative defense that Plaintiff is exempt from the payment of overtime pursuant to the FLSA's Motor Carrier Exemption. 29 U.S.C. § 213(b)(1).  On March 5, 2013, and again today, Trimac filed its opposition to Plaintiff's Motion and designated evidence that show Plaintiff is not entitled to summary judgment.

With this Motion, Trimac respectfully requests the Court to enter summary judgment in its favor, conclude that was exempt from the payment of overtime, enter judgment in its favor on Plaintiff's Third Cause of Action.  As the briefing relating to Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") indicates, the parties' dispute regarding the applicability of the Motor Carrier Exemption centers on whether the "interstate commerce" prong of the Motor Carrier Exemption is satisfied—namely, whether Plaintiff hauled a leg in interstate commerce or could have reasonably been expected to make an interstate delivery, thereby rendering him exempt from overtime.  But the evidence establishes three reasons why Plaintiff is not entitled to summary judgment.  First, Plaintiff hauled an out-of-state leg to Oregon.  Second, local argon deliveries Plaintiff regularly made were merely the final phase of unmistakably interstate movements.  Finally, Trimac's customer, Air Products and Chemicals, Inc. ("Air Products"), expected **all** of the Santa Clara Drivers to be available for and subject to dispatch on both in-state legs of interstate argon deliveries and out-of-state legs—both of which qualify as interstate movements.  Therefore, the Motor Carrier exemption applies, and Trimac is entitled to judgment on Plaintiff's Third Cause of Action.

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

## II.   STATEMENT OF THE ISSUES TO BE DECIDED

1.   Whether Trimac is entitled to summary judgment on its affirmative defense to Plaintiff's overtime claim that Plaintiff was exempt from the payment of overtime under the FLSA, 29 U.S.C. § 213(b)(1).

## III.   BACKGROUND FACTS

### A.   General Background

Trimac is a regulated, for-hire motor carrier authorized by the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation to provide trucking services. *See Def.'s Request for Judicial Notice* (ECF No. 33).[1]  Trimac provides these services to shippers in the United States. *Declaration of Dan O'Connor* ("O'Connor Declaration I") (attached hereto as *Exhibit P*), ¶ 2.  One of Trimac's customers is Air Products and Chemicals, Inc. ("Air Products"), which manufactures and then supplies industrial and specialty gas products to customers. *Id.*; *Declaration of Francis G. Hartman* ("Hartman Declaration") (attached hereto as *Exhibit E*), ¶ 2; *Declaration of Vincent G. Clark* ("Clark Decl.") (attached hereto as *Exhibit F*), ¶ 2.  Trimac provides its services to Air Products at Air Products' facility in Santa Clara, California (the "Santa Clara Branch"). *O'Connor Decl. I*, ¶ 2; *Hartman Decl.*, ¶ 5.  Trimac bills Air Products by the mile for the transportation services it provides. *Declaration of Terry Gillit* ("Gillit Decl.") (attached hereto as *Exhibit G*, ¶ 4.

From 2008 to 2010, Trimac employed a total of 25 drivers at the Santa Clara Branch (the "Santa Clara Drivers"). *Second Declaration of Dan O'Connor* ("O'Connor Decl. II") (attached hereto as *Exhibit H)¸* ¶ 2. The Santa Clara Drivers were required to possess a valid CDL with a hazardous materials endorsement ("Hazmat Endorsement") to haul Air Products' gas products. *O'Connor Decl. I*, ¶ 5; *Hartman Decl.*, ¶ 9; *Deposition of Jerry Hartman* ("Hartman Dep.") (attached hereto as *Exhibit I*) at 17:22-18:10.  Therefore, Trimac required all of the Santa Clara Drivers, including Plaintiff, to possess and maintain a commercial driver's license with a full Hazmat Endorsement. *O'Connor Decl. I*, ¶¶ 5, 14; *Deposition of Douglas Roberts* ("Roberts Dep. I")

---

[1] Plaintiff did not oppose Trimac's request for judicial notice.

2

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

(attached hereto as *Exhibit J*) at 18:12-18.  The Santa Clara Drivers reported to work in different shifts to provide 24-hour coverage to Air Products.  *Deposition of Dan O'Connor* ("O'Connor Dep.") (attached hereto as *Exhibit K*) at 16:9-24.  A small handful of drivers worked in teams where two drivers would be dispatched on a leg by Air Products.  *O'Connor Dep*. at 64:13-65:23 (testifying the Santa Clara Branch had one or two teams depending on customer demand).

The Santa Clara Drivers transported the gas products both (1) from the Santa Clara Branch to Air Products' customers and (2) to and from the Santa Clara Branch and other Air Products' facilities inside and outside the state of California.  *O'Connor Decl. I*, ¶ 3.  The Santa Clara Drivers transported several different Air Products' gas products, including nitrogen, argon, helium, hydrogen and oxygen.  *O'Connor Decl. II*, ¶ 3; *Hartman Decl.*, ¶ 4; *Declaration of Kevin Decelles* ("Decelles Decl.") (attached hereto as *Exhibit L*), ¶ 13.[2]  Though the products were often delivered to local customers, all of those products could have been and were transported out-of-state.  *Hartman Decl.*, ¶ 4; *Decelles Decl.*, ¶ 10. Some of the products delivered by the Santa Clara Branch drivers were purified beyond the standard grade of purification.  *Hartman Dep.* at 17:5-17.  These products were called "mega class" products.  *Id.*  Drivers needed training in order to offload mega-class products from the trailer to the customer's tank, but any driver with a hazmat endorsement was qualified to transport mega-class products.  *O'Connor Decl. I*, ¶ 6; *Hartman Decl.*, ¶ 9.  Therefore, Plaintiff and

---

[2]  Kevin Decelles ("Decelles") is employed by Trimac Management Services Limited Partnership ("Trimac Management"), which provides, among other things, information technology services to Trimac.  *Decelles Decl.*, ¶ _2.  The documents attached to Decelles' declaration are spreadsheets containing electronically stored information that has been extracted from Trimac's electronic databases.  *Id.*, ¶¶ 3-12. Mr.  Decelles' declaration establishes that the spreadsheets are admissible as business records under Fed. R. Evid. 803(6).  *Id.*; *see U–Haul Int'l v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043–44 (9th Cir. 2009) (printouts prepared for litigation from databases that were compiled in the ordinary course of business are admissible as business records to the same extent as if the printouts themselves were prepared in the ordinary course of business); *Saxon Mortgage Servs., Inc. v. Hillery*, C-08-4357 EMC, 2009 WL 2435926, at *1-2 (N.D. Cal. Aug. 3, 2009) (quoting 5-803 Weinstein's Fed. Evid. § 803.08[8][a]) ("[t]he phrase "other qualified witness" is given a very broad interpretation. The witness need only have enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business. The witness need not have personal knowledge of the actual creation of the documents or have personally assembled the records.).  *See also Declaration of Jane DeLisi* (attached hereto as *Exhibit M*), ¶¶ 2-5 (also testifying about the processing of inputting the information into the database during the normal course of business).

3

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

all other Santa Clara Drivers were qualified to transport any of the industrial gas products distributed out of the Santa Clara Branch, including all of the mega-class products.  *O'Connor Decl. I*, ¶ 6; *Hartman Decl.*, ¶ 9; *Pl.'s Dep.* at 105:17-106:4.

### B.    Air Products' Argon Shipments

One of the products delivered by Plaintiff was argon.  *Declaration of Douglas Roberts* ("Roberts' Decl.") (attached hereto as *Exhibit Q*), ¶ 5; *Hartman Decl.*, ¶ 11; *Clark Decl.*, ¶ 3.  The argon delivered by the Santa Clara Drivers originated from three facilities: Chandler, Arizona; Galt, California; and Santa Clara, California.  *Hartman Decl.*, ¶ 12; *Clark Decl.*, ¶ 4; *Roberts Dep.* at 99:12-19 (testifying he saw argon being delivered from Chandler, Arizona).  Argon that is shipped from Chandler, Arizona is offloaded at the Santa Clara Branch into an intake crude argon tank.  *Clark Decl.*, ¶ 3.  The argon in that tank is a mixture of argon produced at the Santa Clara site or produced and delivered to the Santa Clara site from Air Products facilities in Galt, California and Chandler, Arizona.  *Id*.  The argon is taken from the crude argon tank through a deoxidation and distillation process and is then put into the purified argon tank.  *Id.*  The delivery drivers then take the purified argon from that tank to deliver it to the Air Products' customers.  *Id.*  The purification process is a continuous process that runs 24-hours per day, 7 days per week because of customer demand.  *Id.*

While at the Santa Clara site, the argon remains subject to Air Products' control.  *Hartman Decl.*, ¶ 13.  Air Products owns the argon from the time it is shipped to the Santa Clara site to the time it is delivered to the end customer.  *Id.*  The argon is not stored indefinitely.  To the contrary, it is stored only for the period of time it takes to process it from crude argon to purified argon.  *Clark Decl.*, ¶ 4.  And the entire process, from when the crude argon is offloaded into the intake crude argon tank until the argon is placed in the purified argon tank, takes at most four days.  *Id.*  Moreover, the purification process does not change the essential character of the argon.  *Id.*, ¶ 5.  The product is 97% argon when it begins the process, and it is 99.99% argon when it is delivered to the customer. *Id.*  Of the (at-most) four-day process, the deoxidation and distillation process only takes about one hour to complete.  *Id.*, ¶ 4.

4

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

When Air Products ships the argon to the Santa Clara site, it does not intend for the argon to sit in storage indefinitely for customers who have not yet been identified.  *Id.*, ¶ 12.  Rather, the argon is shipped to the Santa Clara site to satisfy the short term demand of existing Air Products' customers.  *Id.*  Air Products delivers products to its customers pursuant to ongoing contracts or understandings it has with its existing customers, such as hospitals.  *Id.*, ¶ 6.  Avoiding an interruption in the supply of the product at the customers' facility is an absolutely critical component of the services Air Products provides to its customers.  *Id.*  Air Products ships the crude argon with the intent that it will be processed and then delivered to existing Air Products' customers in a short amount of time, typically within days and not weeks.  *Id.*, ¶ 12.

## C.  Air Products' Dispatching Policies And Practices

Air Products dispatched the Santa Clara Drivers from Allentown, Pennsylvania.  *Hartman Dep.* at 6:25-7:6; *Hartman Decl.*, ¶¶ 5-7; *O'Connor Dep.* at 38:10-13.  Air Products made the ultimate determination on which driver to dispatch on a leg and provided dispatch instructions directly to the drivers.  *Hartman Decl.*, ¶ 8; *Hartman Dep.* at 9:18-10:11; *O'Connor Decl. I*, ¶ 7; *Deposition of Douglas Roberts*, *Amador v. Trimac Transportation Services (Western) Inc.*, Case No. CV10-4112-CHK(JCx) ("Pl.'s Amador Dep.") (attached hereto as *Exhibit N*) at 28:8-13, 83:22-24 (stating Air Products would dispatch him and other drivers on any delivery that Air Products felt Air Products needed the drivers to do).  Drivers could not reject a load that was dispatched to them unless there was a valid safety reason to do so.  *Hartman Dep.* at 14:1-8; *O'Connor Decl. I*, ¶ 7.

Air Products' policy with respect to dispatching was that it scheduled deliveries in order to ensure there was not an interruption of the supply of the product to Air Products' customer.  *Hartman Decl.*, ¶¶ 6-7.  In other words, avoiding an interruption in the supply of product to the customer was the critical element, and Trimac drivers were there to ensure this happened.  *Id.*  The specific driver who will be dispatched on a particular load was secondary to Air Products' main concern of its customers having a continuous supply of its products.  *Id.*

Deliveries were scheduled and dispatched according to customer demand by tracking the customers' inventory levels using a gauge in the customers' vessels.  *Id.*, ¶ 6.  Once the customer

5

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

needed additional products, Air Products dispatched a leg and expected Trimac to deliver the product to the customer. *Id.* The importance of avoiding interruptions in the supply of products to its customer drove Air Products to expect all of Trimac's drivers to be available for and subject to dispatch on any leg within the constraints of the law, such as maximum hour of service regulations. *Id.*, ¶ 7. Trimac also expected the Santa Clara Drivers to complete legs assigned to them by Air Products, *O'Connor Decl. I*, ¶ 7; *Pl.'s Dep.* at 99:7-20 (Q: "Did Trimac have a policy with respect to the instructions given by dispatchers? A. The policy was that we should do what [Air Products] said.").

Plaintiff and the other Santa Clara Drivers were subject to being dispatched by Air Products on two types of interstate movements. First, Air Products sometimes dispatched the Santa Clara Drivers on legs that traveled outside the state of California. *Hartman Dep.* at 28:14-17; *O'Connor Decl. I*, ¶ 3. When new drivers were hired, Dan O'Connor ("O'Connor"), the Branch Manager of the Santa Clara Branch, advised new drivers they may be required to haul an out-of-state leg. *O'Connor Decl. I*, ¶ 4.; *O'Connor Dep.* at 91:2-15. And although Air Products dispatched many of the out-of-state legs to team drivers, Air Products also dispatched several local drivers on out-of-state deliveries. *Decelles Decl.*, ¶ 10, Exs. 1-4[3] This happened, for example, if the team drivers were unavailable or Air Products had a delivery that was not normally dispatched to team drivers. *Hartman Decl.*, ¶ 9-10; *O'Connor Decl. I*, ¶ 6; *O'Connor Dep.* at 64:16-19, 66:1-67:9. In either of these situations, the Air Products dispatchers would work with the local Trimac Branch Manager for assistance in determining which drivers should be dispatched on the leg. *Id.* And any driver would have been subject to being dispatched on these legs. *Hartman Decl.*, ¶¶ 6-7, 9; *O'Connor Decl. I*, ¶ 6; *O'Connor Dep.* at 66:1-67:9. Of the 25 Santa Clara Drivers employed from 2008 to 2010, 16 were dispatched on out-of-state legs. *Decelles Decl.*, ¶ 10, Exs. 1-4[4].

---

[3] Some of the product dispatched out-of-state was mega class oxygen. *Hartman Dep.* at 17:5-11. But because all drivers were qualified to transport any of the Air Products' gas products, a driver who was not trained to offload mega-class products was still subject to being dispatched on a mega-class leg. *Hartman Decl.*, ¶ 9. *O'Connor Decl. I*, ¶ 6.

[4] *Exhibit 4* of the Decelles Declaration is a summary of the voluminous TMW spreadsheets attached to the Decelles Declaration as *Exhibits 1-3* (the "TMW Summary"). *Decelles Decl.*, ¶¶ 10-12. The

6

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

The second type of interstate movement made by the Santa Clara Drivers involved argon deliveries.  *Hartman Decl.*, ¶ 14.  From 2008 to 2010, a total of 20 Santa Clara drivers, including Plaintiff, delivered argon from the Santa Clara Branch that originated out-of-state.  *Pl.'s Decl.*, ¶¶ 5, 7; *Hartman Decl.*, ¶ 12; *Clark Decl.*, ¶ 4, *Decelles Decl.*, ¶ 10.  All of the drivers were subject to being dispatched on argon deliveries, and none of the drivers could reject dispatch.  *Hartman Decl.*, ¶ 14; *Hartman Dep.* at 14:1-8; *O'Connor Decl. I*, ¶ 7.

On average, almost 6.04.%[5] of the Santa Clara Drivers' legs were interstate movements—namely out-of-state legs or in-state legs of  argon movements ("Interstate Legs").[6]  *Decelles Decl.*, ¶ 11, Ex. 1-4.  Notably, 22 of the 25 Santa Clara Drivers hauled legs that were interstate movements.  *Decelles Decl.*, ¶ 10, Ex. 4.  Moreover, Trimac's records related to the approximate number of miles driven by the Santa Clara Drivers on each of their legs demonstrate that, in terms of the actual time spent in interstate commerce, the Santa Clara Drivers spent a significant amount of time completing interstate movements.  *Decelles Decl.*, ¶ 11.  Specifically, in 2008, approximately 30.4% of all the miles driven by Santa Clara Drivers were driven on Interstate Legs; in 2009, approximately 31.46% of all the miles driven by Santa Clara Drivers were driven on Interstate Legs; and in 2010, approximately 34.46% of all the miles driven by Santa Clara Drivers were driven on Interstate Legs.  *Decelles Decl.*, ¶ 13, Ex. 4.[7]

---

underlying spreadsheets were previously produced Plaintiff.  In addition, as demonstrated above, the underlying spreadsheets are admissible as business records.  *See* Fed. R. Evid. 803(6).  Therefore, the summary is admissible as substantive evidence under Fed. R. Evid. 1006.  *See Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996) (setting forth standard for the admissibility of summary evidence under Rule 1006).

[5]  The total number of Interstate Legs (512+434+447=1,393) divided by the total number of legs (7,473+8,023+7,580=23,076) = approximately 6.04%.

[6]  Legs that were dispatched to two drivers were counted twice because those legs provided two opportunities to be dispatched.

[7]  Even if local argon deliveries are not included, the TMW Summary demonstrates a significant number of miles driven on out-of-state legs—22.41% for 2008, 28.01% for 2009, and 29.26 % for 2010—and just under 3% of the legs were out-of-state (689 out-of-state legs (192+233+264) divided by 23,076 total legs (7,473+8,023+7,580) is approximately 2.99%).

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

### D.   **Plaintiff**

Plaintiff worked for Trimac as a driver out of the Santa Clara Branch from July 28, 2008, through November 20, 2010.  *Pl.'s Decl.* (ECF No. 27-1), ¶ 2; *O'Connor Decl. I*, ¶ 14.  Plaintiff held a CDL with a Hazmat Endorsement.  *O'Connor Decl. I*, ¶ 14; *Pl.'s Dep.* at 18:12-18.  O'Connor was the branch manager at the Santa Clara Branch when Plaintiff applied for a position, and O'Connor and Plaintiff met before Plaintiff was hired.  *O'Connor Decl. I*, ¶ 2 (stating he was branch manager of the Santa Clara Branch since 2003); *Pl.'s Dep.* at 17:7-24.

Plaintiff was trained on, among other things, the hours of service ("HOS") regulations implemented and enforced by the FMCSA,[8]  *O'Connor Decl. II*, ¶ 4, and Plaintiff maintained HOS driver logs pursuant to those regulations.  *Pl.'s Dep.* at 9:13-15.  During his training, Plaintiff was dispatched on a leg of mega-class oxygen that went to Oregon.  *O'Connor Decl. I*, ¶ 14; *Pl.'s Dep.* at 66:14-20, 67:16-25; *Pl.'s Amador Dep.* at 24:16-25:17.  He drove the tractor and trailer on this leg and, when it was time to deliver the product to the customer, the other driver dispatched on the load offloaded the mega class oxygen to the customer's vessel.  *Roberts Dep.* at 66:14-20, 67:16-25, 106:3-107:1.[9]

Just like the other Santa Clara Drivers, Plaintiff had no control over the legs on which he was dispatched.  *O'Connor Decl. I*, ¶¶ 7, 14; *Roberts Dep.* at 110:14-19; *Roberts Amador Dep.* at 28:8-13, 83:22-24, 99:7-20.  Roberts admits he received his dispatch instructions directly from Air Products and could not reject a load that was dispatched to him unless there was a specific safety-related reason.  *Pl.'s Dep.* at 38:4-6, 38:19-25; 110:14-19.  Therefore, he was eligible for and subject to being dispatched on any Interstate Leg.  *Hartman Decl.*, ¶ 14; *O'Connor Decl. I*, ¶¶ 5-6, 14.  Indeed, Although Plaintiff claims he did not have a reasonable expectation of being dispatched on mega-class oxygen, Plaintiff admits he could have been dispatched on a mega-class oxygen leg on one day's notice.  *Pl.'s Dep.* at 105:17-107:21 (admitting he was qualified to haul mega-class oxygen and that Air Products could have dispatched him a mega-class oxygen leg); *Id.* at an 107:22-108:12

---

[8] *See* 49 C.F.R. Part 395.
[9] Address Plaintiff's objection to this information.

8

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

(acknowledging that he could have been dispatched if someone "specifically told [him] it would happen, say, **tomorrow**, next week, in the coming months, that kind of thing.") (emphasis added).

Plaintiff was also subject to being dispatched on local deliveries of argon. Indeed, Plaintiff admits he was actually dispatched on local argon deliveries during his employment. *See Pl.'s Decl.*, ¶ 7; *Pl.'s Dep.* at 10-11. Plaintiff has no personal knowledge of how Air Products makes the decision to dispatch argon to its customers. *Pl.'s Dep.* at 102:1-11.

Once dispatched on a leg, Plaintiff had to weigh the tractor and trailer before leaving the yard. *Pl.'s Dep.* at 35:3-37:2, 68:25-70:21; *O'Connor Decl. I*, ¶ 3. The combined weight of the tractor and trailer was more than 10,000 pounds. *Pl.'s Dep.* at 35:3-37:2, 68:25-70:21, Ex. 3 at 7; *O'Connor Decl. I*, ¶ 3.

## IV.   **ARGUMENT**[10]

The FLSA's Motor Carrier Exemption provides employers do not have to pay overtime to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). In order to qualify for the Motor Carrier Exemption, the employee must: (1) be employed by an employer subject to the Secretary of Transportation's jurisdiction under the Motor Carrier Act; and (2) be engaged in activities of a character directly affecting the safety of operation of motor vehicles in the interstate or foreign transportation of passengers or property. 29 C.F.R. § 782.2. The sole dispute between the parties in this case is whether the "interstate commerce" prong of the inquiry is satisfied.[11] As demonstrated below, the evidence establishes Plaintiff was engaged in interstate commerce because Plaintiff (1) transported goods across state lines; (2) delivered the last

---

[10] The applicable standard for summary judgment is set forth in the parties' prior briefing and by the Court in its *Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment* (ECF No. 42).

[11] In his Reply Brief in support of Plaintiff's Motion, Plaintiff did not dispute Trimac's contention that it was subject to the Secretary of Transportation's jurisdiction and that Plaintiff was engaged in activities affecting the safety of operation of motor vehicles weighing more than 10,000 pounds. *See Request for Judicial Notice* (ECF No. 33); *Pl.'s Dep.* at 35:3-37:2, 68:25-70:21, Ex. 3 at 7; *O'Connor Decl. I*, ¶ 3.

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

leg of an interstate movement; and (3) was at all times during his employment subject to being dispatched on an Interstate Leg.  Consequently, Trimac is entitled to summary judgment.

### A.    Plaintiff Transported Goods Across State Lines

The Secretary of Transportation has jurisdiction over the transportation of property between "a State and a place in another State."  49 U.S.C. § 13501(1)(A).  Plaintiff was hired at the end of July, 2008.  *Pl.'s Decl.* (ECF No. 27-1), ¶ 2; *O'Connor Decl. I*, ¶ 14.  When he was first employed, Plaintiff was dispatched on a leg that went from Santa Clara, California to Oregon.  *O'Connor Decl. I*, ¶ 14; *Pl.'s Dep.* at 66:14-20, 67:16-25; *Pl.'s Amador Dep.* at 24:20-25:16.  By completing this leg, Plaintiff engaged in activities that directly affected the safety of operation of motor vehicles in the interstate transportation of property.  29 C.F.R. §782.7(b)(1) ("Highway transportation by motor vehicle from one state to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce under both [the FLSA and the Motor Carrier Act.]").  Accordingly, Plaintiff was exempt from the payment of overtime for four months after that leg.  *See Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1156 (9th Cir. 1994); DOL Fact Sheet #19.

### B.    Plaintiff Transported Goods In The Last Leg Of An Interstate Movement

A driver who only makes deliveries within points in the same state can still satisfy the interstate commerce requirements—and therefore be exempt from the payment of overtime—if the property being delivered originated from outside the state and the intrastate portion of the route is merely part of the final phase of the unmistakably interstate movement.  *See Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469-70 (9th Cir. 1997).  Here, Plaintiff admits he hauled argon that originated from outside the state of California.  *Pl.'s Decl.*, ¶ 7; *see also Hartman Decl.*, ¶ 12; *Clark Decl.*, ¶ 4.  However, Plaintiff claims these legs do not constitute movements in "interstate commerce" because, according to Plaintiff, the argon "was processed in Santa Clara and then held in a tank for future delivery to customers yet to be identified."  *Pl.'s Br.* at 6.  Contrary to Plaintiff's unsupported claims, the evidence establishes Plaintiff's argon legs were a continuation of an interstate movement.

10

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

**1.     Air Products Had The Required Shipper's Intent At The Time Of The Shipment**

"Whether transportation is interstate or intrastate is determined by the essential character of the commerce, *manifested by the shipper's fixed and persisting transportation intent at the time of the shipment*, and is ascertained from all of the facts and circumstances surrounding the transportation." *Klitzke*, 10 F.3d at 1469 (emphasis in original).  "[E]ven intrastate deliveries can be considered part of interstate commerce if the property in question was originally delivered from out-of-state and the intrastate route is merely part of the final phase of delivery."  *Watkins v. Ameripride Servs.*, 375 F.3d 821, 825 (9th Cir. 2004).  To that end, a temporary stop in a warehouse does not terminate the interstate movement where the product was shipped pursuant to existing contracts or understandings with customers.  *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 569 (1943).

Air Products had the fixed and persisting transportation intent to deliver the argon from Chandler, Arizona to its customers in Northern California.  When Air Products ships the argon to the Santa Clara site, it does not intend for the argon to sit in storage indefinitely for customers who have not yet been identified.  *Hartman Decl.*, ¶ 12.  Rather, the argon is shipped to the Santa Clara site by Air Products to satisfy the short term demand of existing Air Products' customers pursuant to ongoing contracts or understandings it has with those customers.  *Jacksonville Paper Co.*, 317 U.S. at 569; *Klitzke*, 110 F.3d at 1070.[12]  Avoiding an interruption in the supply of the product at the customer's facility was an absolutely critical component of the services Air Products provides to its customers.  *Hartman Decl.*, ¶¶ 6-7.  Air Products shipped the crude argon with the intent that it would be processed and then delivered to existing Air Products' customers in a short amount of time, typically within days and not weeks.  *Id.*, ¶ 12.

---

[12] Consequently, this case is distinguishable from the issue decided in *Watkins*, upon which Plaintiff relies.  375 F.3d at 826 -27.  Unlike here, in *Watkins*, there was no evidence that the uniforms were shipped to the warehouse to satisfy the short term demand of the Defendant's customers pursuant to ongoing contracts or understandings.  Likewise, here the company who controls the shipment of the product—Air Products—is also the company that sells the product to the ultimate customer, where in *Watkins* the end users were customers of the company operating the warehouse.

11

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

### 2.    The Purification Of Argon Did Not Terminate The Interstate Movement

Although the argon was purified before it was delivered to the customers, the purification process did not terminate the interstate movement because the essential character of the argon was not "materially altered." *Cruz v. S. Waste Sys.*, 2010 WL 309016, at *4 (interstate movement of cardboard not broken even though cardboard is compacted and baled before it is shipped out-of-state). The product is 97% argon when it begins the process, and it is 99.99% argon when it is delivered to the customer. *Clark Decl.*, ¶¶ 3-4. Moreover, the argon is not stored indefinitely; it is stored only for the period of time it takes to process it from crude argon to purified argon. *Id.*, ¶ 4. The deoxidation and distillation process only takes about one hour to complete. *Id.* And the entire process, from when the crude argon is offloaded into the intake crude argon tank until the argon is placed in the purified argon tank, takes at most four days. *Id.* This short intermediate stay does not terminate the interstate movement. *See, e.g, Cruz,* 2010 WL 309016, at *5 (30-60 day stay in facility did not terminate interstate movement); *Glanville v. Dupar, Inc.*, 2009 WL 3255292, at * 11 (S.D. Tex. September 25, 2009) (21-28 day stay in warehouse did not terminate interstate movement). Plaintiff does not any personal knowledge of any facts that would to refute this evidence. *Pl.'s Dep.* at 99:4-8, 100:6-8, 100:23-103:7.

The Department of Labor's Field Operations Handbook ("FOH") confirms Trimac's position that the limited processing that occurred at the Santa Clara Branch did not interrupt the interstate movement. The FOH provides:

> There are certain situations, however, where processing or packaging operations are performed on goods during the course of their movement to a specified out-of-state destination under such circumstances that the exemption may be applied to the transportation preceding the operations as well as to that which follows. Such transportation is viewed as a single movement for purposes of the Motor Carrier Act and FLSA Sec. 13(b)(1) where the practical continuity of the journey from the point of origin within the state to the intended out-of-state destination has not been broken. The following examples illustrate this principle:
>
> (1) Coal being shipped to an out-of-state buyer is hauled to a tipple where, in a continuous operation, it is unloaded from the truck and cleaned, crushed, or graded and loaded directly into railroad cars for shipment out-of-state.

12

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

FOH, 24c02.  Much like the coal that is processed in a continuous operation before it is transported to the customers, the argon is processed in a continuous operation before it is transported to customers. The processing of coal did not interrupt the interstate movement, and neither did the processing of argon here.  *Id.*

In his Reply Brief, Plaintiff argues that 29 C.F.R. § 782.7(c) supports Plaintiff's claim that he was not exempt.  Section 782.7(c)(3) states "drivers who transport goods from a producer's plant to the plant of a processor, who, in turn, sells goods in interstate commerce, **the first producer's goods being a part or ingredient of the second producer's goods.**"  (emphasis added).  Plaintiff's reliance on 29 C.F.R. § 782.7(c) is similarly misplaced.  First, Air Products owns the argon throughout the entire process, which is a distinct situation from the situation explained in § 782.7(c).  *Hartman Decl.*, ¶ 13.  Second, the regulation only applies where the product being delivered is merely one "ingredient" of the ultimate product that travels in interstate commerce.  In Plaintiff's case, the same product that traveled across state lines—argon—is the same product he delivered to customers— argon—because the processing did not change the essential character of the product.  Simply put, § 782.7(c)(3) has no applicability to this case.

Ultimately, Air Products' shipping intent is not outweighed by the minimal processing that occurs before the argon is delivered to customers.  The totality of the circumstances demonstrates Air Products' fixed and persisting intent was to deliver the argon from Chandler, Arizona to the customers in California.  *Century Indem. Co. v. Carlson*, 133 F.3d 591, 598 (8th Cir. 1998) (internal quotations and citations omitted) ("[T]he current test requires us to examine all of the facts and circumstances surrounding the transportation; to focus on any one fact would violate this standard."). The undisputed evidence demonstrates each of Plaintiff's argon legs was a part of an interstate movement and therefore subjected Plaintiff to the jurisdiction of the Secretary of Transportation.  As a consequence, Plaintiff was exempt from the FLSA's overtime requirements.  *Klitzke*, 110 F.3d at 1469-70.  Trimac is therefore entitled to summary judgment.

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

C.     **Plaintiff Was Subject To The Motor Carrier Exemption Pursuant To The Pool Of Drivers Rule**

Plaintiff was exempt from the payment of overtime under the Motor Carrier Exemption not only because he actually hauled goods in interstate commerce, but also because he could reasonably have been expected to haul one of those interstate movements at any time.  The Motor Carrier Exemption applies even if a driver has not personally driven in interstate commerce if, because of company policy and activity, the driver could reasonably be expected to make an interstate movement. *Morris v. McComb*, 332 U.S. 422, 433-34 (1947); *Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1156 (9th Cir. 1994) (quoting the Secretary of Transportation's Notice of Interpretation, 46 Fed.Reg. 27,902, 37,903 (1981) ("If jurisdiction is claimed over a driver who has not driven in interstate commerce, evidence must be submitted that the carrier has engaged in interstate commerce and that the driver could reasonably have been expected to make one of the carrier's interstate runs."); *Bishop v. Petro-Chemical Transport, LLC*, 582 F. Supp. 2d 1290, 1298 (E.D. Cal. 2008). Here, Plaintiff could have reasonably been expected to make an interstate delivery.

**1.  Plaintiff Was Subject To Being Dispatched On Both Types Of Interstate Legs**

Plaintiff was subject to being dispatched on *any* of Air Products leg.  Air Products scheduled deliveries based upon immediate customer demand and made the ultimate decision on which driver to dispatch on a leg. *Hartman Decl.*, ¶¶ 6-8.  The specific Trimac driver dispatched on a leg was secondary to Air Products' main goal of providing continuous supply of product to its customers. *Id.* The importance of avoiding interruptions in the supply of products to its customer drove Air Products to expect all of Trimac's drivers to be available for and subject to dispatch on any leg within the constraints of the law, such as maximum hours of service regulations. *Hartman Decl.*, ¶ 7.  Trimac also expected the Santa Clara Drivers to complete legs assigned to them by Air Products, *O'Connor Decl.* ¶ 7; *Pl.'s Dep.* at 99:7-20; and Plaintiff admits he could not have rejected a leg that Air Products dispatched to him except for a valid safety reason. *Pl.'s Dep.* at 38:4-6, 38:19-25, 110:14-19; *see also Hartman Dep.* at 14:1-8; *O'Connor Decl.*, ¶ 7.  Therefore, Plaintiff and the other Santa Clara Drivers were subject to being dispatched by Air Products on any of the legs, including both

14

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

types of Interstate Legs. Indeed, 22 of the 25 Santa Clara Drivers hauled an Interstate Leg from 2008-2010. *Decelles Decl.*, ¶ _10, Ex. 4.

It is undisputed that Air Products dispatched Interstate Legs to Santa Clara Drivers that Plaintiff could reasonably have been expected to make. First, Plaintiff could reasonably have been expected to be dispatched on a local delivery of argon that originated from Chandler, Arizona. *Morris*, 332 U.S. at 433-434 and n.7 (concluding drivers were exempt from overtime because they were subject to being dispatched on the first or last leg of an interstate movement). *Hartman Decl.*, ¶¶ 11-14; *Clark Decl.*, ¶ 4; *Roberts Dep.* at 99:12-19; *Pl.'s Decl.*, ¶¶ 5, 6. Indeed, Plaintiff was **actually** dispatched on local argon deliveries. *Pl.'s Decl.*, ¶¶ 5-6.

Second, Plaintiff could reasonably have been expected to be dispatched on an out-of-state leg. Air Products expected all of the Santa Clara Drivers to be available on any leg, including the legs that traveled outside the state of California. *Hartman Dep.* at 28:14-17. Moreover, Plaintiff and O'Connor met during the hiring process to discuss what the job entailed, and O'Connor always advised new drivers they may be required to haul an out-of-state leg. *O'Connor Decl. I*, ¶ 4; *O'Connor Dep.* at 91:2-15; *Pl.'s Dep.* at 17:7-24. *See Bishop*, 582 F. Supp. 2d at 1302 (the fact drivers were told they could be dispatched on interstate hauls during the hiring process was evidence that drivers had reasonable expectation of making interstate hauls). In the same vein, not only was Plaintiff trained on compliance with the DOT's hours of service regulations, Plaintiff admitted he filled out the hours of service driver logs required by those regulations. *O'Connor Decl. II*, ¶¶ 4, *Pl.'s Dep.* at 9:13-15. *See Bishop*, 582 F. Supp. 2d at 1302 (noting fact the drivers complied with the hours of service regulations was evidence that drivers had reasonable expectation of making interstate hauls). Although Air Products dispatched many of the out-of-state legs to team drivers, Air Products also dispatched several local drivers on out-of-state deliveries. *Hartman Decl.*, ¶¶ 9-10; *Decelles Decl.*, ¶ 10, Ex. 4. *See Morris*, 332 U.S. at 433-434 (concluding drivers were exempt from overtime even though the interstate trips "were not distributed equally to each driver."). This happened, for example, if the team drivers were unavailable or Air Products had a delivery that was not normally

15

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

dispatched to team drivers.  *Hartman Decl.*, ¶¶ 9-10; *O'Connor Decl. I*, ¶ 6; *O'Connor Dep.* at 64:16-19, 66:1-67:9.

### 2.     The Potential For An Assignment On An Interstate Leg Was More Than Remote

The possibility that Plaintiff would be dispatched on these legs was not "remote" as Plaintiff has claimed.  On average, almost 5.77% of the Santa Clara Drivers' legs were Interstate Legs. *Decelles Decl.*, Ex. 4.  *Cf. Morris*, 332 U.S. 422, 433-34 (1947) (carriers' drivers whose interstate trips constituted less than 4% of their total deliveries deemed to fall under motor carrier exemption); *Barefoot v. Mid-America Dairymen, Inc.*, 826 F. Supp. 1046, 1049 n. 2 (N.D. Tex. 1993) (truck drivers who made only 28 interstate trips over the course of 4 years, which constituted only a "small portion" of the employers' total deliveries, deemed to fall under the motor carrier exemption), *aff'd*, 16 F.3d 1216 (5th Cir. 1994); *Turk v. Buffets, Inc.*, 940 F. Supp. 1255, 1262 (N.D. Ill. 1996) (drivers whose interstate loads constituted more than 1% of the total loads deemed to fall under the motor carrier exemption).  What is more, in 2008, approximately 30.4% of all the miles driven by Santa Clara Drivers were driven on Interstate Legs; in 2009, approximately 31.46% of all the miles driven by Santa Clara Drivers were driven on Legs; and in 2010, approximately 34.46% of all the miles driven on Santa Clara Drivers were driven on Interstate Legs.  *Decelles Decl.*, ¶ 13, Ex. 2.  These significant mileage numbers provide an even better gauge of interstate activity than numbers of trips alone because Trimac billed Air Products by the mile.  *See Gillit Decl.*, ¶ 4.  *See Morris*, 332 U.S. at 427 (using the carrier's revenue figures to analyze the level of the carrier's interstate activity).

Plaintiff's claim that only four of the drivers were subject to being dispatched on these legs is simply not true.[13]  First, Plaintiff's claim is exposed by Trimac's records, which show 16 Santa Clara Drivers were dispatched on out-of-state legs from 2008 to 2010.  *Decelles Decl.*, ¶ 10, Ex. 4.  Second, Air Products dispatched more than mega-class oxygen on out-of-state legs.  *Hartman Decl.*, ¶ 4; *Decelles Decl.*, ¶ 13.  Third, Plaintiff's argument is based on the false premise that drivers must have special training in order to haul oxygen.  The only training necessary for mega-class products was to

---

[13] Plaintiff's claim that only the most experienced and senior drivers were subject to being dispatched on out-of-state legs is also wrong.  Trimac did not have a policy that only the most senior and trained drivers were assigned the out-of-state deliveries.  *O'Connor Decl. I*, ¶ 9.

16

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

**offload** the product, not to **haul** the product. *O'Connor Decl. I*, ¶ 6; *Hartman Decl.*, ¶ 9. All of the drivers, including Plaintiff, were qualified to transport any of the Air Products' gas products, including mega-class oxygen. *O'Connor Decl. I*, ¶ 6; *Hartman Decl.*, ¶ 9; *Pl.'s Dep.* at 18:12-18. Therefore, a driver who was not trained to offload mega-class products was still subject to being dispatched on a mega-class leg.[14] Significantly, Plaintiff admits he was actually dispatched on a mega-class oxygen out-of-state leg, and further admits he could have been dispatched on a mega-class oxygen leg on one day's notice. *Pl.'s Dep.* at 105:17-107:21 (admitting he was qualified to haul mega-class oxygen and that Air Products could have dispatched him a mega-class oxygen leg); *Id.* at 107:22-108:12 (acknowledging that he could have been dispatched if someone "specifically told [him] it would happen, say, **tomorrow**, next week, in the coming months, that kind of thing.") (emphasis added). And this is precisely Air Product's understanding of the extent to which local drivers like Plaintiff would be available for an out-of-state leg. *See Hartman Decl.*, ¶¶ 2-10); *O'Connor Dep. at 66:1-67:9* (testifying any driver would have been subject to being dispatched on these legs).

Although Plaintiff himself may not have personally hauled more than one out-of-state leg, he, along with all other Santa Clara Branch Drivers, were reasonably expected to do so if the need arose.[15] Simply put, Air Products dispatched the drivers; it expected all of the drivers to be available and subject to any of its loads, and Plaintiff admitted he could not reject a leg. Consequently, Plaintiff was exempt from the payment of overtime under the Motor Carrier Exemption, and Trimac is therefore entitled to summary judgment.

---

[14] For example, a driver who is not qualified to offload mega-oxygen could be dispatched on a mega-oxygen leg if a team driver was unavailable to work due to vacation or sickness. *Hartman Decl.*, ¶ 9-10; *O'Connor Decl.* , ¶ 6; O'Connor Dep. at 64:16-19, 66:1-67:9.

[15] Plaintiff's argument that Plaintiff was not exempt because he never hauled an out-of-state leg, *see Pl.'s Reply Br.* at 4-6, simply ignores the Pool of Drivers Rule that Plaintiff concedes is valid. The rule assumes that a driver has not left state, and provides the driver is nevertheless exempt if, because of company policy and activity, the driver could reasonably be expected to make an interstate movement.

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities

**V.    CONCLUSION**

For the reasons discussed above, Defendant, Trimac Transportation Services (Western) Inc., respectfully requests that the Court grants is Motion for Partial Summary Judgment, and for all other just and proper relief.

Dated:  May 7, 2013                                    Respectfully submitted,


                                                       */s/Christopher J. Eckhart*
                                                       Christopher J. Eckhart
                                                       Christopher C. McNatt, Jr.

                                                       Attorneys for Defendant,
                                                       Trimac Transportation Services
                                                       (Western) Inc.


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing was filed electronically on May 7, 2013.  Notice of this electronic filing will be sent to the following parties of record by the operation of the Court's electronic filing system.

    Michael L. Tracy
    Megan E. Ross
    Law Offices of Michael Tracy
    2030 Main Street, Suite 1300
    Irvine, CA  92614


                                                       */s/Christopher J. Eckhart*
                                                       Christopher J. Eckhart

4827-1942-9395, v.  8-1942-9395, v.  5

Case No. 5:12-cv-05302-HRL
Defendant's Notice of Motion and Motion for Partial Summary
Judgment; Memorandum of Points and Authorities