**\*E-FILED: September 30, 2013\***

NOT FOR CITATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS ROBERTS,<br><br>   Plaintiff,<br><br>  v.<br><br>TRIMAC TRANSPORTATION SERVICES (WESTERN), INC.,<br><br>   Defendant. | Case No. 5:12-cv-05302 HRL<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Re: Docket Nos. 27, 33, 44] |

Plaintiff Douglas Roberts sues for alleged wage and hour violations under federal and state law. With respect to his claim under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 207 and 216, defendant Trimac Transportation Services (Western), Inc. (Trimac) contends that Roberts is exempt from the FLSA's overtime provisions pursuant to the Motor Carrier Safety Act. Each party moves for summary judgment on Trimac's motor carrier exemption defense. Both plaintiff and defendant have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. The court has considered the moving and responding papers, as well as the arguments of counsel.[1] For the reasons discussed below, plaintiff's summary judgment motion is granted and defendant's cross-

---

[1] The court previously granted defendant's Fed. R. Civ. P. 56(d) motion for a continuance on plaintiff's summary judgment motion re the motor carrier exemption defense, and the parties filed supplemental briefing on that issue. Defendant subsequently filed an affirmative cross-motion for summary judgment on its defense, and the parties' respective motions were consolidated for a single motion hearing.

motion for summary judgment is denied.[2]

## BACKGROUND

Trimac is a regulated, for-hire motor carrier authorized by the Federal Motor Carrier Safety Administration of the U.S. Department of Transportation. It provides trucking services to shippers in the United States. Air Products and Chemicals (Air Products) is one of Trimac's customers. Air Products manufactures and supplies industrial and specialty gas products. Trimac provides its services to Air Products at Air Products' Santa Clara facility, i.e., Trimac's Santa Clara Branch is physically located at Air Products' Santa Clara facility.

Roberts worked for Trimac as a driver from July 2008 through November 2010. For the most part, he transported nitrogen and argon for Air Products. Nitrogen is produced locally, and plaintiff says that he hauled it from the Santa Clara facility to customer locations in California.

Argon, on the other hand, is shipped to the Santa Clara facility from Air Products' locations in Galt, California and Chandler, Arizona. The argon is purified at the Santa Clara facility and put in a single holding tank before it is delivered to customers.

The FLSA generally provides for overtime pay for employees. 29 U.S.C. § 207. Section 213(b)(1) of the statute, however, says that overtime pay does not apply to any employee whose qualifications and maximum hours of service are regulated by the Secretary of Transportation under section 204 of the Motor Carrier Safety Act (49 U.S.C. §§ 10101, et seq.). Section 204 of the Motor Carrier Safety Act says that the Secretary of Transportation has jurisdiction over "transportation by motor carrier" that occurs "between a place in a State and a place in another State." 49 U.S.C. § 13501(1)(A). This so-called motor carrier exemption applies to employees who (1) work for carriers whose transportation is subject to the Secretary of Transportation's jurisdiction and (2) engage in activities affecting the safe operation of motor vehicles on public highways in transportation in interstate commerce. 29 C.F.R. §782.2(b)(2). The exemption is construed narrowly, and the employer bears the burden of showing that the exemption applies. Reich v. American Driver Service, Inc., 33 F.3d 1153, 1156 (9th Cir. 1994).

---

[2] The court's evidentiary rulings will be filed separately.

2

There is no dispute that Trimac is a motor carrier subject to the Secretary of Transportation's jurisdiction.[3] But, the parties disagree whether Roberts hauled goods in interstate commerce and whether he reasonably could have been expected to make interstate deliveries.

## LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See id. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'"

---

[3] Defendant has submitted for judicial notice a copy of its operating permit, issued by the Interstate Commerce Commission, as proof that Trimac is subject to the Secretary of Transportation's jurisdiction. Plaintiff does not object to the request for judicial notice. And, as discussed above, he does not dispute the Secretary's authority over Trimac. Trimac's request for judicial notice (Dkt. No. 33) is granted.

Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. Id.

# DISCUSSION

To establish its motor carrier exemption defense, Trimac must show that plaintiff (1) hauled goods in the "practical continuity of movement" in interstate commerce or (2) reasonably could be expected to cross state lines. Bishop v. Petro-Chemical Transport, LLC, 582 F. Supp.2d 1290, 1298 (E.D. Cal. 2008) (citing Watkins v. Ameripride Services, 375 F.3d 821, 825-26 (9th Cir. 2004). As discussed more fully below, there are little, if any, disputed facts. Rather, the parties disagree as to how the facts should be construed and the conclusions to be drawn from them.

**A. Did plaintiff haul argon in a practical continuity of interstate commerce?**

As a general principle, the parties agree that "even intrastate deliveries can be considered part of interstate commerce if the property in question was originally delivered from out-of-state and the intrastate route is merely part of the final phase of delivery." Watkins, 375 F.3d at 825 (citing Klitzke v. Steiner Corp., 110 F.3d 1465, 1469 (9th Cir. 1997)). Additionally, a temporary pause (e.g., brief storage in a warehouse) in the transit of goods does not change the interstate nature of a shipment. Interstate commerce includes the intrastate transportation of goods in "a practical continuity of movement from the manufacturers or suppliers without the state, through [a] warehouse and on to customers whose prior orders or contracts are being filled . . .." Walling v. Jacksonville Paper Co., 317 U.S. 564, 568-69, 63 S. Ct. 332, 87 L.Ed. 460 (1943). It is undisputed that at least some of the argon at Air Products' Santa Clara facility was shipped from Arizona and held temporarily in a storage tank before delivery to customers. The point of contention between Roberts and Trimac is whether plaintiff's local argon deliveries properly are characterized as the last leg of the Arizona argon shipments.

"Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by [the] shipper's fixed and persisting transportation intent at the time

1   of the shipment and is ascertained from all of the facts and circumstances surrounding the
2   transportation." Klitzke, 110 F.3d at 1469. See also Watkins, 375 F.3d at 825 (the court "must
3   examine the character of the shipments [plaintiff] was charged with delivering, and the intent of
4   the shippers as to the ultimate destination of the goods. The inter-state or intrastate character of
5   the shipment is determined only after considering the entire panoply of facts and circumstances
6   surrounding the transportation.").

Here, Trimac presents the declaration of Air Products' Logistics Manager, Francis Hartman, to support its contention that Air Products had the shipping intent to deliver argon from Arizona to its California customers. The upshot of his testimony is that Air Products ships argon to its Santa Clara facility based upon the anticipated need of the company's existing customers because a key aspect of Air Products' service is avoiding any interruption in the supply of products at its customers' facilities. (Dkt. 43-1, Hartman Decl. ¶ 6). Air Products does this by tracking its customers' inventory levels using a gauge in the customers' vessels. (Id.). "Once the customer needs additional products, Air Products dispatches a load and expects Trimac to deliver the product to the customer." (Id.). According to Hartman: "When Air Products ships the argon to the Santa Clara site, it does not intend for the argon to sit in storage indefinitely for customers who have not yet been identified. Rather, the argon is shipped to the Santa Clara site to satisfy the short term demand of existing Air Products' customers. Air Products ships the crude argon with the intent that it will be processed and then delivered to existing Air Products' customers in a short amount of time, typically within days and not weeks." (Id. ¶ 12). There is also no dispute that Air Products owns the argon from the time it is shipped to the Santa Clara facility and, while at the Santa Clara site, the product remains under Air Products' control.[4] (Id. ¶ 13).

Citing the so-called "Petroleum Products" test,[5] Roberts contends that Air Products could not possibly have the requisite shipping intent because at the time argon is shipped from Arizona,

---

[4] For this reason, plaintiff's arguments based on 29 C.F.R. § 782.7(c) unavailing. The portion of that regulation cited in plaintiff's papers concern "drivers who transport goods from a producer's plant to the plant of a processor, who, in turn, sells goods in interstate commerce, *the first producer's goods being a part or ingredient of the second producer's goods*." (emphasis added).
[5] The Petroleum Products name is derived from the Interstate Commerce Commission's decision in which it applied the three-part test plaintiff cites.

5

Trimac cannot say that the gas was destined for a specific customer or a particular customer location. The court will not engage in extended discussion of that argument, however, because defendant correctly notes that the court is not obliged to apply that test here. See Int'l Brotherhood of Teamsters v. Interstate Commerce Comm'n, 921 F.2d 904, 908 (9th Cir. 1990) (holding that "where the ICC applies the fixed and persisting intent rule to determine the essential nature of commerce, it need not apply the Petroleum Products test.") (citing California Trucking Ass'n v. Interstate Commerce Comm'n, 900 F.2d 208, 212 (9th Cir. 1990)). Indeed, the Ninth Circuit has observed that "'[e]ven though the ICC has never explicitly stated that it was abandoning the more structured [Petroleum Products] test, it appears that its use of that standard has been refined, if not phased out.'" Id. (quoting California Trucking Ass'n, 900 F.2d at 213)).

More persuasive is Roberts' argument that the manner in which argon is handled at the Santa Clara facility belies Trimac's claim that Air Products has the shipping intent to deliver argon in a practical continuity of movement from Arizona to its California customers. But, it is not so much the purification of the argon, as the lack of a specific customer and the manner in which the argon is stored, that persuades this court that Roberts' local argon deliveries are not the last leg of an interstate shipment.

With respect to the purification process, Trimac maintains that the essential nature of the argon is not changed and that the process essentially is "argon in, argon out." Vincent Clark, Air Products' Western Region Operations Manager, avers that the product is 97% argon at the beginning of the process and 99.99% argon when it is delivered to the customer. (Dkt. 43-2, Clark Decl. ¶ 5).[6] Additionally, Clark says that the entire process from offloading of the crude argon into the intake tank until the placement of purified argon in the purified argon tank takes, at most, four days. And, of those four days, the deoxidation and distillation process only takes an hour. (Id. ¶ 4). The parties cite a host of cases addressing the processing of various materials and products. None concern the processing of gas products. The two that are most akin to the argon processing here are Advantage Tank Lines, Inc., 10 I.C.C.2d 64, 1994 WL 71208 (I.C.C.)., cited

---

[6] The court finds that Clark is qualified to testify about the argon purification process at the Santa Clara facility, and plaintiff's objections to the cited portions of his declaration are overruled.

6

1  by Trimac, and <u>Kimball v. Goodyear Tire & Rubber Co.</u>, 504 F. Supp. 544 (E.D. Tex. 1980), cited
2  by plaintiff.  In <u>Advantage Tank</u>, the Interstate Commerce Commission concluded that adding
3  ethanol and detergent additives to gasoline does not constitute substantial product modification
4  because the product is, essentially, "gasoline in, gasoline out."  In <u>Kimball</u>, the court concluded
5  that distilling crude isoprene to make pure isoprene and raffinates (a byproduct) for the creation of
6  synthetic rubber and resins was substantial processing that changed the nature of the product.  This
7  court finds that the purification of argon at the Santa Clara facility is more like the situation in
8  <u>Advantage Tank</u> than that in <u>Kimball</u> and that the argon processing did not change the essential
9  nature of the gas.

10  As stated above, however, where Trimac's claimed interstate shipping intent breaks down
11  is the storage of the argon at the Santa Clara facility, coupled with the fact that shipments are
12  made based on anticipated customer need, rather than in response to a specific order.  To be sure,
13  goods shipped in anticipation of existing customers' needs may well fall within the practical
14  continuity of interstate commerce.  <u>Jacksonville Paper Co.</u>, 317 U.S. at 569-70.  In <u>Jacksonville
15  Paper Co.</u>, the defendant said that most of its customers were part of "a fairly stable group" whose
16  "orders are recurrent as to the kind and amount of merchandise."  <u>Id.</u> at 569.  Additionally,
17  defendant asserted that its manager could "estimate with considerable precision the needs of his
18  trade."  <u>Id.</u>  On the record before it, however, the Supreme Court concluded that the defendant
19  failed to present evidence showing that the goods in question were different from those acquired
20  and held for local disposition.  <u>Id.</u> at 570.

21  This court finds that the same is true of the argon at issue here.  Indeed, the argon from
22  Arizona is held (i.e., commingled) in the same tank as the argon shipped intrastate from Galt,
23  California.  Unlike other materials and products (e.g., uniforms, paper goods, produce, and other
24  such goods at issue in the cases cited by the parties), the Arizona argon cannot be segregated from
25  the California argon.  Thus, everything Air Products says about the shipment and processing of the
26  Arizona argon is equally true of the locally produced argon that is shipped to the Santa Clara
27  facility.

28  Citing to <u>Int'l Brotherhood of Teamsters</u>, Trimac argues that, in order for the motor carrier

7

exemption to apply, Air Products does not need to ship argon to Santa Clara to fill specific customer orders. There, the Ninth Circuit held that paper products shipped from out-of-state to a company's distribution center, based on anticipated customer need (not specific customer orders), remained in interstate commerce during the subsequent in-state delivery to customers. A key factor in that decision, however, was the company's use of storage-in-transit provisions, which "evidence[d] a more specific intent to ship the goods in interstate commerce." 921 F.2d at 909. "Accordingly, courts require evidence beyond a stable customer base and historical purchasing patterns to demonstrate a shipper's 'fixed and persisting intent.'" Veliz v. Cintas Corp., No. C03-1180 RS, 2009 WL 1107702 at *5 (N.D. Cal., Apr. 23, 2009). Trimac has presented no such additional evidence here. Moreover, the company in Int'l Brotherhood of Teamsters maintained separate and distinct stock-keeping numbers to "ensure[] that out-of-state goods will not be commingled with California-produced products." Int'l Brotherhood of Teamsters, 921 F.2d at 910. As discussed above, there is simply no way to segregate the Arizona argon from the argon produced in California.

So, did plaintiff haul argon in a practical continuity of interstate commerce? On the record presented, the court concludes that the answer is no.

**B. Was plaintiff reasonably expected to cross state lines?**

"A driver is considered to be driving in interstate commerce if the driver is called upon to drive in interstate commerce as part of the driver's regular employment, or, even if the driver has not personally driven in interstate commerce, if, because of company policy and activity, the driver could reasonably be expected to drive in interstate commerce." Bishop, 582 F. Supp.2d at 1298. "As such, if a carrier does interstate work and assigns drivers randomly to that driving, all of its drivers are considered subject to the Motor Carrier Safety Act." Id. "However, a driver is not subject to the Motor Carrier Safety Act if there is no possibility of driving interstate or the possibility is remote." Id. See also Reich, 33 F.3d at 1156 (stating that "if the employee's minor involvement can be characterized as de minimis, that employee may not be subject to the Secretary of Transportation's jurisdiction at all."). "[D]etermining the 'character' of interstate driving involves a fact-specific analysis, including an examination of the method by which the

employer assigns the interstate activity to the pertinent class of employees, the nature of the employer's business, and perhaps to a lesser degree, the proportion of interstate-to-intrastate employee activity." Masson v. Ecolab, Inc., No. 04 Civ. 4488 MBM, 2005 WL 2000133 at *9 (S.D.N.Y., Aug. 17, 2005). See also Bishop, 582 F. Supp.2d at 1298 (same).

For the most part, the parties agree about the nature of Trimac's business and the manner in which routes were assigned to drivers. As discussed above, Trimac's business involves interstate commerce. Air Products generally handled the actual dispatching of Trimac's drivers. Some of Trimac's drivers worked in teams of two. Roberts was not a team driver. He was what both sides refer to as a "local" driver.

When he was first hired, Roberts drove an interstate leg to Oregon with another driver as part of his training.[7] (Dkt. 43-8, Decelles Decl., Ex. 1 at p. 64, DEF 03859; Dkt. 32-1, O'Connor Decl. ¶ 14; Dkt. 43-6, Roberts Depo. at 66:14-20, 67:16-25). Presumably, this is the trip plaintiff refers to when he says that was the only time he ever drove as part of a team. (Suppl. Roberts Decl. ¶¶ 4-5). Aside from that one trip, Roberts only drove routes within California for the remainder of his employment with Trimac.

Trimac argues that plaintiff is subject to the motor carrier exemption because he regularly hauled the final leg of interstate shipments of argon from Arizona. For the reasons discussed above, the court rejects that argument.

Defendant nevertheless maintains that Roberts reasonably was expected to drive in interstate commerce as part of his employment. Here, Trimac presents evidence that plaintiff was trained on the Federal Motor Carrier Safety Administration's hours of service (HOS) regulations; that plaintiff maintained HOS records as required by those regulations; that Trimac required all of its drivers, including plaintiff, to have a valid commercial driver's license with a hazardous materials endorsement; that Trimac's drivers did not have control over legs on which he was dispatched; that Trimac's drivers could not reject a load dispatched to them, except for specific safety reasons; and that Roberts himself testified that he could have been dispatched on an out-of-

---

[7] Trimac correctly notes that plaintiff was exempt from the FLSA's overtime requirements for a period of four months after that Oregon trip. Reich, 33 F.3d at 1156.

state leg if he "was specifically told it would happen, say, tomorrow, next week, in the coming months, that kind of thing." (Dkt. 43-6 (Roberts Depo. at 108:10-12).

Plaintiff does not refute these facts. But, as the court understands it, the fundamental dispute here is whether there was more than a remote possibility that Roberts could be dispatched on an interstate leg. Specifically, the parties disagree whether there was a single pool of 25 drivers at the Santa Clara facility who were all subject to taking interstate routes (as Trimac contends) or whether there were two pools of drivers---a pool of team drivers and a pool of local drivers---as plaintiff claims. Defendant has submitted analyses of its records and claims that its numbers show, among other things, that between 2008 and 2010, the percentage of out-of-state legs driven by the Santa Clara drivers ranged from 2.5% to 3.48% and that 16 of the 25 drivers were dispatched on out-of-state legs (Dkt. 43-8, Decelles Decl. ¶¶ 10, 12, Ex. 4).[8] Defendant says that, further disproving plaintiff's two-pool theory, these records also show that team drivers did not work exclusively in teams, but also drove single-driver routes 80% of the time.

Plaintiff maintains that, in his experience, interstate routes were assigned to teams. Plaintiff's counsel conducted her own analysis of Trimac's records and submitted a declaration attesting to her findings, which she says shows that the percentage of out-of-state trips made by local drivers is infinitesimally small. The court agrees that Roberts has not established a foundation for his personal knowledge as to how Air Products made its dispatching decisions. Additionally, Trimac's objection to plaintiff's counsel's declaration is sustained.

Even so, based on defendant's own arguments and evidence, the court concludes that Trimac has not met its burden in establishing that the motor carrier exemption applies. Caselaw indicates that in looking at how out-of-state routes are assigned, a key factor is whether such assignments are made indiscriminately as to the entire group of employees in question. In <u>Morris v. McComb</u>, the Supreme Court held that the motor carrier exemption applied to all of the defendant's drivers, including two who had not actually driven interstate routes. 332 U.S. 422, 433-34, 68 S. Ct. 131, 92 L.Ed 44 (1947). Although only 3.65% of the drivers' total trips were in

---

[8] The court assumes that these numbers do not include local deliveries of argon, which Trimac included as "interstate legs" in some of its other calculations.

10

interstate commerce, and even though some drivers made such trips more often than others, the court found it reasonable to apply the motor carrier exemption to all of defendant's drivers because the defendant did not distinguish between interstate and intrastate routes, and the interstate trips were "shared indiscriminately" among the drivers.[9] Id. at 433. Thus, any of the drivers could be called upon at any time to cross state lines. And, ever since McComb, courts have recognized the significance of the indiscriminate assignment of interstate trips. See, e.g., Reich, 33 F.3d at 1154 ("[Defendant] indiscriminately assigned any interstate travel to its drivers using a 'first in, first out' method, and therefore, all of its drivers reasonably could have been expected to engage in interstate commerce."); Bishop, 582 F. Supp.2d at 1301-02 (noting the significance of indiscriminate assignment of interstate routes).

Here, Trimac acknowledges that many of its interstate trips were assigned to teams. But, it says that such routes were also assigned to several local drivers. That would happen, for example, if a team driver was unavailable and a local driver filled in, or if Air Products had a delivery that typically was not dispatched to a team. (Dkt. 43, Trimac Suppl. Opp. at 6; Hartman Decl. ¶¶ 9-10; O'Connor Depo. at 64:16-19, 66:1-67:9). In those situations, Air Products would work with Trimac to find a driver to dispatch on those loads. What this suggests to the court is that, unlike Morris, interstate trips were not indiscriminately or randomly assigned among all 25 drivers. Rather, it seems that interstate trips were assigned to teams and only sometimes to local drivers in certain circumstances. Additionally, the assignment decisions apparently were based on a number of factors, including what product was being hauled, where and when it was being delivered, logistical considerations, and whether the delivery or other customer needs required a team. Moreover, "[t]hat unexpected vacancies may be filled indiscriminately does not establish that all drivers could at some time travel interstate routes." McGee v. Corporate Express Delivery Sys., No. 01C1245, 2003 WL 22757757 at *6 (N.D. Ill., Nov. 20, 2003) (citation omitted). Thus, although Roberts perhaps could have been called upon to take an out-of-state trip under certain

---

[9] The two drivers who never made interstate trips were found to have worked for the defendant only six months and during months when trips in interstate commerce were less frequent. Morris, 332 U.S. at 433.

circumstances, on the record presented, Trimac has not shown more than a remote possibility that it could happen.

## ORDER

Based on the foregoing, plaintiff's motion for summary judgment on Trimac's motor carrier exemption defense is granted and Trimac's cross-motion for summary judgment is denied.

**SO ORDERED**.

Dated: September 30, 2013

_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

5:12-cv-05302-HRL Notice has been electronically mailed to:

Christopher Chad McNatt , Jr    cmcnatt@scopelitis.com, mlazo@scopelitis.com

Christopher James Eckhart    ceckhart@scopelitis.com, nberry@scopelitis.com

Megan E. Ross    mross@michaeltracylaw.com

Michael Lion Tracy    mtracy@michaeltracylaw.com, calendar@michaeltracylaw.com